### ARNOLD v. WATSON.

Opinion delivered July 12, 1909.

1. MORTGAGES—POWER TO SUBSTITUTE TRUSTEE.—Under a mortgage appointing a trustee and authorizing the mortgagee, in case such trustee should die or neglect to carry out this trust, to appoint any other suitable person to act as such trustee, the mortgagee was authorized to substitute a trustee where the original trustee had moved out of the State and was not in a position to act. (Page 331.)

2. SAME—PRESUMPTION FROM RECITALS OF TRUSTEE'S DEED.—While the recitals of a substituted trustee's deed are not evidence of the validity of his appointment, yet, after the validity of such appointment is established by proof *aliunde,* the recitals of his deed, showing substantial conformity to the requirements of the deed of trust, are *prima facie* true as against the mortgagor and his privies, and the burden of showing their falsity, in equity as well as at law, is upon the party assailing the deed. (Page 332.)

3. SAME—VALIDITY OF APPRAISEMENT OF LAND.—Proof that the appraisers appointed to appraise mortgaged property went to the land but did not walk or ride over it is insufficient to overcome the presumption, arising from the recitals of the trustee's deed, that the appraisement was duly made. (Page 333.)

Appeal from Lawrence Chancery Court, Eastern District; *George T. Humphries,* Chancellor; affirmed.

#### STATEMENT BY THE COURT.

This is a suit by appellant against the appellees to set aside a deed executed by J. A. Watkins as trustee to Elbert L. Watson. The complaint alleged that Thomas Arnold died in Lawrence County in 1889, the owner in fee of certain lands, which are described in the complaint; that appellant was one of four heirs; that Elbert L. Watson claimed to have a mortgage on the lands to secure an indebtedness of $2,818; that, after the death of

Arnold, Watson probated his claim, and received a payment, leaving a balance due him of $2,000 on the original claim.

The grounds alleged for setting aside the deed are that: "Elbert L. Watson fraudulently discharged Thos. J. Watson, the duly appointed trustee, and without right or authority appointed the defendant J. A. Watkins to act in his stead, and caused the said substituted trustee to make a fraudulent sale of said lands on the 10th day of November, 1893; that the substituted trustee fraudulently neglected to cause the lands to be appraised according to law; that he fraudulently sold for $2,950, when there was in fact only $2,000 due; that at said sale Elbert L. Watson, after causing the same to be made at a time and place to suppress free competition in bidding and fraudulently agreeing with other parties present who might have bid on the lands that he would grant certain favors and immunities provided they would forbear to bid against him at the sale, purchased all the lands for the sum of $2,993.50, which was far below its real value."

The complaint then alleged that: "On the 11th day of December, 1893, without waiting for the time for redemption to expire, the substituted trustee executed to Elbert L. Watson a deed purporting to convey to him said lands, all of which was a fraud upon the rights of plaintiff, who was then a minor of the age of 9 years; that, since the execution of said deed, Elbert L. Watson died, leaving a will by which he is informed and believes that defendants have become the owners of the rights of Elbert L. Watson in the lands. That the rental value of the lands is $1,000 per year; that there was a saw mill and cotton gin on the lands when Elbert L. Watson took possession of it, of the value of $1,000, which defendants have removed."

The prayer was for an accounting, charging defendants with machinery removed and rents for the year 1894 and each year since that time and for value of machinery removed, and that the balance due on the mortgage be paid out of said sum, and that he have judgment for one-fourth interest in said land as one of the four heirs at law of Thomas Arnold, deceased, and for one-fourth of whatever balance may be due from rents and profits after paying the mortgage, and all other proper relief.

The answer denied the material allegations of the complaint, and set up title as the heirs of Watson, who had died after ob-

taining the deed from Watkins, which they allege was duly executed in pursuance of the power contained in the deed of trust.

The decree dismissed the complaint for want of equity.

*W. A. Cunningham* and *Smith & Blackford,* for appellant.

1. The substituted trustee had no power to sell, no contingency having arisen giving the beneficiary the right to appoint a substituted trustee. The trustee, if absent from the State, was only temporarily so, and no reason is shown for not calling on him to act. No neglect could be charged against him until he had been requested to act and had failed after a reasonable time to do so. 55 Ark. 326.

2. The appraisement was not such as is contemplated by the statute. Sandels & Hill's Dig. §§ 5112, 5113.

3. Fraud and collusion of the purchaser with others to suppress bidding invalidates the sale. 38 Ark. 589.

*Campbell & Suits,* for appellees.

1. The burden of overthrowing the trustee's deed is on the plaintiff, its recitals showing substantial compliance with the requirements of the deed of trust being taken as *prima facie* true. 61 Ark. 464; 71 Ark. 484; 53 Miss. 307; 109 Ill. 79; 43 Ia. 268.

Hence the burden was on the plaintiff to overcome by proof the recitals of the trustee's deed with reference to the appointment of the original trustee, the authority of Watson under deed of trust to appoint another suitable person to act as trustee upon the neglect of the original trustee to carry out the trust, the fact that he *had neglected* to carry out or execute the trust, and the appointment of J. A. Watson as substituted trustee.

2. The appraisement was regular. The record not only shows that the land was fairly appraised, so far as E. L. Watson was concerned, but it goes further, and establishes the fact that there was a conspiracy to compel him to pay more for the land than it would bring on the market at that time if a sale was had. 79 Ark. 4.

3. The proof fails to make out a case of fraud or suppression of bidding. This case is clearly distinguishable from that relied on by appellant, 38 Ark. 584, and it has no application here. Moreover in that case there was no right to redeem. In this the right to redeem existed for 12 months after the sale.

4. Appellant states no cause of action. Neither he nor any one for him has paid or tendered the amount of indebtedness. 74 Ark. 242; 71 Ark. 484.

5. The claim is stale, and appellant is barred by laches. 87 Ark. 232; 71 Ark. 209.

Wood, J. (after stating the facts). Appellant urges the following grounds for reversal:

1st. Because the substituted trustee had no power to sell, the contingency never having arisen giving the beneficiary the right to appoint a substituted trustee.

2d. Because there was no real appraisement of the lands as contemplated by the statute, the appraisement being fixed by the agent of the beneficiary, who was also the purchaser, and not by the appraisers.

3d. Because the purchaser by fraud and collusion prevented other bidders from participating at the sale.

We shall dispose of these in the order named.

1. Thos. J. Watson was the trustee named in the deed of trust. The deed of trust contained the following provision: "But, should said Thomas J. Watson die or neglect to carry out this trust, then said Elbert L. Watson, or the holder of said notes, may by indorsement hereon or on the margin of the record of this deed name and appoint any other suitable person to act as such trustee, and such person, when so appointed, shall have all the authority herein given to said Thomas J. Watson." The deed of trust is indorsed on the margin as follows. "I, Elbert L. Watson, hereby appoint and designate J. A. Watkins as trustee to execute the within trust, and confer upon him all the power and authority for such purpose as the within deed of trust confers upon Thomas J. Watson, the trustee herein named; who has neglected to execute this trust. Newport, Arkansas, September 27, 1893. E. L. Watson."

This statement of the beneficiary in the deed of trust is certainly evidence to be considered by the chancellor in determining whether the contingency arose which gave the benficiary the right to substitute a trustee who could better determine than the beneficiary whether the trustee had neglected to carry out the trust. This statement of the beneficiary shows that he did determine that the trustee had neglected to carry out the trust,

and that should end the matter, especially in the absence of any evidence to the contrary. Such evidence as the record discloses tends to confirm the statement of the beneficiary, that the trustee had neglected to execute the trust. For it appears that prior to September 27, 1893, and "soon after the opening up of Oklahoma, he (the trustee) went over there," that "he was out of the State, and not in a position to act." The evidence is almost conclusive that the condition had arisen that authorized the beneficiary to appoint J. A. Watkins trustee. In the case of *Stallings* v. *Thomas,* 55 Ark. 326, the contingency that authorized the substitution had not arisen. The mortgage provided in that case that the beneficiary might substitute another trustee in case the trustee named in the mortgage "should die, be absent from the county or fail or refuse to execute it." The opinion states that the trustee "was alive and in the county at the time of the sale, he was not requested to execute the power, and did not refuse or fail to do it." The case is authority for the position that a trustee can not be substituted for the trustee named in the mortgage unless the conditions which authorize the substitution are found to exist. Here it is clearly shown that they did exist. In *Stallings* v. *Thomas, supra,* it appears affirmatively that the trustee named in the mortgage was not requested to execute the power, and that he was in the county where he could have executed it if the request had been made. But here the facts are different. The trustee named in the deed "was out of the State, and not in a position to act." That being true, a request to act could not have been complied with, and its necessity therefore was eliminated. Moreover, there is no affirmative showing here that the beneficiary, Watson, proceeded to substitute a trustee without requesting the trustee named in the deed to act. The language of the indorsement, "who has neglected to execute this trust," implies that the beneficiary had done whatever was necessary for him to do under the circumstances. Otherwise he could not have said that the trustee "had neglected to execute the trust."

2. To be sure, the recitals in the deed of J. A. Watkins as trustee could not be taken as *prima facie* evidence of the validity of his own appointment, that being the subject-matter of the inquiry. But, the validity of such appointment being estab-

lished by evidence *aliunde,* as we have shown, then the recitals of his deed, showing substantial conformity to the requirements of the deed of trust, are *prima facie* true, and the burden of showing their falsity is upon the party assailing the deed.  *McConnell* v. *Day,* 61 Ark. 464; *Ingle* v. *Jones,* 43 Ia. 286; *Beal* v. *Blair,* 33 Ia. 318; *Tartt* v. *Clayton,* 109 Ill. 579.  See also 28 Am. & Eng. Enc. L. 825, notes 10 and 11; *Naugher* v. *Sparks,* 110 Ala. 572; *Tew* v. *Henderson,* 116 Ala. 545.  See note to *Tyler* v. *Herring,* 19 Am. St. 263.  Where the trustee's deed is the subject-matter of attack, the same rule should apply in equity as at law.  The doctrine is applicable generally only to the grantor of the power in the mortgage or deed of trust and his privies, and there can be no good reason why it should apply at law and not in equity.

The trustee's deed contains the following recital: "And whereas the said J. A. Watkins, at the request of said E. L. Watson, did, prior to said day of sale, to-wit, on the 17th day of October, 1893, cause said lands to be duly appraised by W. T. Blackford, S. W. Howard and H. H. Munsel, three householders of said Lawrence County, Arkansas, who were duly appointed by D. S. Jasper, a justice of the peace in and for said county, as the law directs, at which appraisement (Then follows a description of the lands by legal subdivisions, as called for in the deed of trust, together with a separate appraised value as to each subdivision) which appraisement totaled $3,600." According to the rule above announced, the foregoing recitals must be taken as *prima facie* true.  The appellant has undertaken to show that the lands were not "duly appraised" by John Arnold, who testified, on this point, as follows: "Appraisers never went to look at the farms.  John Glass stated to the appraisers that they wanted it appraised, so it would bring the debt, so it would sell, and to appraise it down so they could have it."  And by William Crane, who testified: "I heard John Glass tell the appraisers they wanted it appraised so it would bring the debt and expenses, so the boys could buy it in."  It was also shown by appellant that Glass was E. L. Watson's agent.  It was in evidence that John Arnold lived upon the lands in question at the time the alleged appraisement was made, and that the appraisers met at his house. So when the witness says they never went to look at the farms,

he must have meant that they did not ride or walk over the farm to look at them. The testimony does not show that the appraisers could not and did not view the lands from John Arnold's house, where they met. In *Merryman* v. *Blount*, 79 Ark. 4, we said: The object of the appraisement was to ascertain the true value of the land and to insure, as far as possible, the sale of the land at a fair price, to prevent the possibility of the land being sacrificed at a grossly inadequate price. The report of the appraisers is, of course, made after they are sworn, and the presumption is that they will do their duty and ascertain the value of the land as the law requires, and that this shall be done, not by report or hearsay, but by actually viewing the property. While the statute contemplates an actual view of the property, it does not require an actual entry on the land in order to view it. A reasonable construction of the statute is that the appraisers must have viewed the property before they placed a value upon it. If this view can be had so as to ascertain the true value of the property without entry on the land as well as by actually *going* upon it, then actual entry is not necessary."

There is nothing in the evidence to show that Glass, the agent for Watson, did not have the appraisers duly appointed as shown by the recitals of the trustee's deed. Having been duly appointed, the presumption is they did their duty and ascertained the value of the land as the law required. What John Glass may have said to the appraisers was not material if the appraisers were not influenced by it to make a fraudulent appraisement. The evidence does not show that the lands were appraised at a grossly inadequate value. The preponderance of the evidence does not warrant the conclusion that the lands were appraised at less than their true value. It is certain that the evidence as to the value of the land at the time of the appraisement does not justify a finding of fraud on the part of the appraisers. The appraisement, for aught shown to the contrary, comes well up to the requirements of the law as declared in *Merryman* v. *Blount, supra.*

3. To support his contention that E. L. Watson practiced fraud in suppressing bidding at the trustee's sale, appellant relies upon the following testimony: John Arnold testified: "The morning we went to Walnut Ridge to buy it in, we saw Mr.

Watson, and he said: 'Let me bid it in, and don't you bid on it, and at the end of twelve months you come in, and I will make you a deed to it. The estate can't claim it against you.' During the time 'Abe Phelps wanted to bid on it, and came to me and asked me if I was going to bid on it, and I told him the arrangement I had made, and he said if we boys were going to get it he would not bid, but if Watson was buying it he wanted it. Scarborough wanted it sold in forty-acre blocks, and Watson said it was fixed so the boys would get it."

Henry Arnold testified: "I heard a conversation between John and E. L. Watson. John told Watson that he wanted to bid the land in, and Watson said: 'Let me bid it in, and I will make you a deed to it, and it will hold the other heirs off, or they will come in against it.' We were down at Newport afterward, and Watson said he had not got a deed. When he got the deed, he would make us a deed. There was only one bid, and Watson made that."

A. P. Brown testified: That he knew Watson and the Arnold boys, and that he heard a conversation between them on the day of the sale of the lands at Walnut Ridge, and from the conversation he understood they were talking about arranging the land matter, so that the Arnold heirs could get it at some future date. "As I understood it, they were to have it back by paying what was due at the end of the year."

W. H. Crane testified that he heard a conversation between E. L. Watson and John Glass, his agent, in which Glass told him that he (Watson) would have to buy the land in again, and Watson said: "I won't if you keep your damn mouth shut."

J. A. Watkins testified that after the sale Watson said to the Arnold boys: "Boys, if you want to take it up, I would be glad if you would do so."

It was shown that Judge Scarborough, mentioned in the testimony of John Arnold, was the attorney for the administrator of the Arnold estate, and was present at the sale. This suit was begun January 31, 1906, a little more than thirteen years after the sale. Glass, whose conduct in connection with the appraisement is assailed, died in 1898, and E. L. Watson, whose conduct in connection with the sale is attacked, died in 1901. Appellant is not responsible for the delinquencies of his guardian.

But it is nevertheless true that, if the facts with reference to the conduct of Glass and Watson were as John Arnold testified, he, as guardian of appellant, should have brought suit to set aside the sale long before Glass and Waston died, and was most remiss in his duty for not having done so. Again, according to the testimony of John and Henry Arnold, arrangements had been made for money with which to purchase the land at the sale, but they did not make the purchase because of the understanding they had with Watson that he was to bid it in and let them have it afterwards. If they could have raised the money to buy at the sale, they could have also redeemed before the time expired. If the land was worth between $6,000 and $10,000, as they testify, it does not seem reasonable that they would have let the opportunity pass, but would have insisted on Watson carrying out his promise to make them a deed before their legal rights to redeem had passed forever. John and Henry cross each other in their testimony as to the arrangements that had been made to secure the money before the sale with which to purchase the land. John testified that he had made arrangements with Lawrence County Bank to borrow the money. Henry testified that John told him that the arrangement to get the money was with one James Turner. Learned counsel for appellant say in their brief "that appellant was at the time of the sale a minor of the age of nine years, and that the scheme to have the lands sacrificed was a fraud upon his rights, whether John and Henry Arnold got the benefit of it or E. L. Watson." But doubtless the question with the chancellor was, as it is with us, whether a sale, which, from the recitals of the deed and testimony of the trustee, appears to have been conducted according to law, should be set aside upon the testimony alone of witnesses who confess that they were in the "scheme of fraud, if it be such, upon the rights" of their brother. The testimony of Brown, who was unrelated to the parties and disinterested, shows that, as he understood the conversation between John and Henry Arnold and E. L. Watson on the day of the sale, it was that the "Arnold heirs could get it at some future time; they were to have it back by paying what was due at the end of the year." This corroborates what O. D. Watson, the son of E. L. Watson, who was with his father on the day of the sale, says that his father told the Arnolds, towit: "The law gives you

twelve months to redeem this land, if you want to take advantage of it. All I want is my money. I don't want the land." It corroborates also the testimony of the trustee, who testifies that Watson said to the Arnold boys: "Boys, if you want to take it up, I would be glad if you would do so," which could mean nothing more nor less than that he would be glad if the boys would take up the land, *i. e.,* redeem it: The testimony of Crane is shown not to have been consistent and free from suspicion all the way through, and his testimony of the purported conversation between E. L. Watson and John Glass, Sr., after the sale is not sufficiently definite to show what the parties to the conversation meant by it. It is in the nature of hearsay evidence.

Giving all the testimony in the record careful consideration, and scrutinizing the sale with that scrupulous care required to protect all the rights of the minors, who are ever the special wards of chancery, we are unable to find any warrant in this record for setting aside the decree and finding of the chancellor. The law imputes good and not evil notions to the sayings and doings of men that appear upon their face to be regular and free from any suspicion of fraud. We are unwilling, from the testimony in this record, after this great lapse of time, to put the "trail of the serpent" over the conduct of those who were not assailed until death had closed their mouths. The law does not justify us in doing so. *Naugher* v. *Sparks, supra.*

Decree affirmed.